IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

STEVE RIDDICK,                          )
                                        )
                    Plaintiff,          )       Case No. 7:20cv00447
                                        )
v.                                      )       **MEMORANDUM OPINION**
                                        )
TRENT, *et al.*,                        )       By:   Hon. Thomas T. Cullen
                                        )             United States District Judge
                    Defendants.         )

Steve Riddick, an inmate in the custody of the Virginia Department of Corrections

("VDOC") proceeding *pro se*, filed this civil rights complaint under 42 U.S.C. § 1983. He alleges

that three mental health professionals and a former warden at Red Onion State Prison ("Red

Onion") delayed or denied him access to mental health treatment. On August 17, 2021, the

court granted in part and denied in part defendants' motion to dismiss and granted Riddick's

request to voluntarily dismiss certain claims. (ECF Nos. 42, 43.) That ruling left for resolution

Riddick's Eighth Amendment deliberate indifference to serious medical need claims against

defendants Kiser (the former warden) and psychology associates Huff, Fletcher, and Trent.

The court specifically dismissed, however, any claims against Trent based on events after July

13, 2018.[1]  (*See* Mem. Op. 8–9 [ECF No. 42].)

---

[1] The court's prior opinion did not construe the complaint as asserting any claims against the other defendants after that date, and so it did not explicitly dismiss any such claims against them. But defendants' summary judgment motion assumes any claims based on conduct after July 13, 2018—if they had been included in the complaint—have been dismissed, and Riddick does not argue to the contrary. (*Compare* Defs.' Mem. Supp. Mot. Summ. J. 1 [ECF No. 51] *with* Pl.'s Opp'n to Mot. Summ. J. [ECF No. 60].) Moreover, the rationale for the dismissal of the claims against Trent—that Dr. McDuffie began treating Riddick on July 13, 2018, and that Trent could not be held liable for any subsequent failure of treatment—applies with equal force to Huff, Fletcher, and Kiser. Thus, the court agrees with defendants that no claims remain in the case against any of the defendants based on incidents after July 13, 2018.

Now pending before the court is defendants' motion for summary judgment, which seeks judgment in their favor on all remaining claims. In support, they contend that Riddick received multiple mental health assessments during the relevant period, and they argue there is no "evidence that any delayed referral to a psychiatrist resulted in actual damage to Riddick." (Defs.' Mem. Supp. Mot. Summ. J. 1 [ECF No. 51].) They further argue that they are entitled to qualified immunity because, at the time of these events, existing precedent did not clearly establish any right to "self-referral to a psychiatrist." (*Id.*)

Riddick has filed a response in opposition, which he styles as a motion for summary judgment. (ECF No. 60.) Also pending before the court is Riddick's motion for preliminary injunction seeking to be released from restrictive housing. (ECF No. 44).

For the reasons set forth herein, the court will grant in part and deny in part Defendants' motion for summary judgment. Specifically, it will grant it as to all defendants except for Trent and will deny it as to the claims against Trent. The court will deny Riddick's motion for summary judgment and his motion for preliminary injunction, and it will briefly address requests for relief contained in other documents Riddick has filed.

## I.

Each defendant has provided an affidavit in support of the summary judgment motion.[2] In determining what facts are undisputed, the court considers these affidavits and attached documents. The court also considers Riddick's opposition, which he has signed under

---

[2] Riddick's opposition complains that three of the affidavits were not signed or notarized. But counsel advised upon their filing that the affidavits by Trent, Huff, and Kiser had been approved by the affiants and that signed copies would be provided shortly. Those signed copies were all filed on December 1, 2021, the same date Riddick signed his opposition. (*See* ECF Nos. 57–59 (signed affidavits of Trent, Huff, and Kiser).)

penalty of perjury. (ECF No. 60, at 22, 23.) Lastly, the court also treats as summary judgment evidence the facts set forth in Riddick's complaint (ECF No. 1) and his supplemental complaint (ECF No. 37), if based on personal knowledge, because he has verified both (ECF No. 37-1). *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (explaining that a *pro se* prisoner's *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations are based on personal knowledge, but an unverified complaint is not).

## A.

At all times pertinent to his claims, Riddick was confined at Red Onion. As noted, defendant Kiser is the former warden of Red Onion. Defendant Fletcher is a psychology associate at Red Onion, and defendants Trent and Huff are former psychology associates there.[3]

VDOC has a number of policies pertaining to mental health treatment, and four are attached to Fletcher's affidavit. As is relevant here, the policies direct that an inmate arriving at a VDOC facility be given a mental health screening. If mental health concerns arise during that initial screening, then emergency mental health services will be provided. After screening, each arriving inmate is assigned a mental health classification code on a scale, with the available options being MH-0, MH-1, MH-2, MH-2S, MH-3, or MH-4. Inmates designated as MH-0 have no current need for mental health services, and offenders who are designated MH-4 have

---

[3] A VDOC "psychology associate" is required to have "at least a Master's degree in psychology, social work, or relevant human services field with knowledge, training, and skills in the diagnosis and treatment of mental disorders, which may include Psychiatric Provider, Social Worker, or Registered Nurse." (VDOC Operating Procedure 730.3, "Mental Health Services: Levels of Service," at 2, attachment A to Aff. of S. Fletcher, Nov. 4, 2021 [Dkt. No. 51-1].)

the greatest need. Codes MH-1, MH-2, MH-2S, and MH-3 represent inmates with minimal, mild, substantial, and moderate impairments, respectively. (VDOC Operating Procedure 730.2, "Mental Health and Wellness Services: Screening, Assessment, and Classification, at 13–14, attachment B to Aff. of S. Fletcher, Nov. 4, 2021 [ECF No. 51-1].) To be classified as MH-2S, an inmate must have a documented diagnosis that meets the criteria for a Serious Mental Illness ("SMI"). (*Id.*) Depending on the inmate's classification code, a clinical psychiatrist may be scheduled to visit with the inmate and determine whether any mental health medications are required. If, at any time, a psychology associate determines that an inmate is in need of psychiatric services, he or she will refer the inmate to the institutional psychiatrist.

## B.

Riddick entered VDOC custody in 2007 at Mecklenburg Correctional Center. He reported no mental health issues at that time, and he was designated MH-0. He later transferred to Wallens Ridge State Prison, his assigned mental health code remained MH-0, and the psychology associates there did not note any signs of mental health distress. (Fletcher Aff. ¶¶ 12–33.) When Riddick was transferred to Red Onion in August 2011, Huff assessed him and determined that the assigned mental health code of MH-0 was appropriate. Huff did not see any indication that Riddick was in need of mental health services at that time.

Between 2011 and 2015, Riddick received a number of mental health evaluations by psychology associates, none of which resulted in a change to his assigned mental health code. According to the records of these evaluations, Riddick did not report any mental health issues at this point. One of these early assessments was conducted by Huff (in January 2012), three

were conducted by Fletcher (in July 2014, October 2014, and January 2015), and the remaining seven assessments in 2012, 2013, and 2014 were completed by other non-party psychology associates. (Fletcher Aff. ¶¶ 34–48; Undated Affidavit of T. Huff ¶ 7 [ECF No. 58].)

Beginning in April 2015, Trent conducted regular mental health evaluations of Riddick and had four visits with him that year (April 2, June 12, October 17, and December 21). According to the records of these visits, Riddick denied having any mental health issues and Trent did not observe any indication that Riddick was in need of additional mental health services.

In 2016, Trent also saw Riddick on four occasions (March 31, July 8, September 30, and November 15). Trent's records reflect that, during the July 8, 2016 visit, Riddick expressed that he was having memory issues, so Trent recommended that he work on puzzles. (Fletcher Aff. ¶ 54; Aff. of D. Trent ¶ 7, Nov. 18, 2021 [ECF No. 57].) In August 2016, Riddick submitted an "Offender Request" form directed to Trent, in which he again mentioned his "memory problems" and stated that he has been in a "deep depression," was "having anxiety," and was "paranoid." He described physical symptoms such as trouble sleeping, focusing, concentrating, speaking, and communicating; having mood swings, violent dreams, and nightmares; and hearing voices. He reported that he would go months without leaving his cell or performing basic grooming tasks, such as showering or shaving. He also reported that he had lost weight. (Aug. 29, 2016 Offender Request [ECF No. 37-2, at 18–19].) Trent responded that "seeing the medical dr. will be appropriate with these types of symptoms." (*Id.*) Riddick's verified complaint states that Trent twice referred him to medical for these problems, who referred him back to the mental health department. (Compl. 1; *see also infra* at Section I-C

(setting forth information from Riddick's sworn statements regarding his treatment).)

According to Trent and other records, in September 2016 Riddick rejected an offer for a confidential office visit with Trent, stating that he had no mental health concerns at that time. (Fletcher Aff. ¶ 55; Trent Aff. ¶ 8.)

In 2017, Trent saw Riddick on six occasions (January 4, March 24, June 6, September 17, November 17, and December 1.) (Fletcher Aff. ¶¶ 57–62; Trent Aff. ¶ 9.) Once again, according to Trent, Riddick denied having any mental health concerns, and the notes from the visits reflect that Riddick rejected Trent's repeated offers to have a confidential office visit. (Trent Aff. ¶ 9.) Around this time, Riddick was screened and remained classified as an MH-0.

In January 2018, Trent again met with Riddick, who denied mental health concerns and rejected an offer for an office visit. (Fletcher Aff. ¶ 63; Trent Aff. ¶ 9.) The following month, Trent met with Riddick, who expressed interest in two alternative housing programs. Trent advised him that he should talk to his case counselor if he was interested in those alternatives. Riddick did not express any issues with his mental health at that time. Trent reviewed Riddick's assigned code of MH-0 and concluded that it was still appropriate. Trent also concluded that Riddick did not qualify as a "seriously mentally ill" (SMI) offender and was therefore ineligible for transfer to VDOC's newly established program for inmates with SMI. (Fletcher Aff. ¶¶ 64–65; Trent Aff. ¶¶ 10–11.)

In March 2018, Trent again assessed Riddick during a periodic segregation review. Riddick denied any mental health concerns at that time, but again reported difficulty with his memory. Riddick again denied an offer for a confidential office visit with Trent. Trent referred Riddick to medical for his memory concerns. (Fletcher Aff. ¶ 66; Trent Aff. ¶ 12.) Later that

month, Riddick submitted a request asking to see someone from the mental health department, and Trent met with him again. Riddick reported depression and anxiety, along with his memory issues, to Trent. Trent decided it would be appropriate to schedule an office visit with Riddick to conduct a "mini-mental status exam" and to continue following up on the reported depression. (Fletcher Aff. ¶ 67; Trent Aff. ¶ 13.)

Trent met with Riddick in April 2018 in a pod office to conduct the mini-mental status exam. Riddick scored a 29 out of 30 on that exam, presumably indicating at least that his cognitive functioning was good, as Trent noted that he did not see any objective signs of mental illness or cognitive defects from the assessment. Riddick asked to be seen by the psychiatrist. Trent instead recommended giving Riddick additional puzzles to help his memory issues, stated that he would follow up with Riddick regarding any increase in his memory deficits, and encouraged Riddick to contact mental health as needed. (Fletcher Aff. ¶ 68; Trent Aff. ¶ 14.)

Although it is not reflected in Trent's April 13, 2018 note (*see* Dkt. No. 51-1, at 226), Trent states in his affidavit that, "[f]ollowing [that] visit, [he] also determined that it would be appropriate, in an abundance of caution, to refer Mr. Riddick to the institutional psychiatrist for an assessment. However, we were unable to schedule an immediate appointment with him; the earliest available appointment was in July 2018." (Trent Aff. ¶ 15.) Riddick argues that Trent's failure to provide a specific date of referral suggests that he did not actually make the referral, but there is nothing in the record—and nothing based on Riddick's personal knowledge—that would either confirm or refute Trent's sworn statement. Moreover, on May 14, 2018, Trent responded to a May 1, 2018 request from Riddick for a referral to be seen by

the psychiatrist, saying, "I am working to secure your appointment. I will have a date for you ASAP." (May 1, 2018 Offender Request [ECF No. 37-2, at 20–21].)

Riddick later followed up with another request asking about the appointment. Trent responded on May 24, 2018, informing Riddick that, after reviewing his "case and discussing it with [the] treatment team, a psychiatric appointment is not warranted." Instead, Trent stated that he would continue to meet with Riddick and provide him "psychoeducational material for dealing with stress and coping skills." (May 24, 2018 Offender Request [ECF No. 37-2, at 22].)

Trent's affidavit does not acknowledge the May 2018 requests and his responses, nor does it discuss or explain his decision to change treatment plans. Specifically, he does not explain why he referred Riddick to the psychiatrist in April and told Riddick on May 14, 2018, that he was working to get an appointment, but then told Riddick ten days later than an appointment was no longer "warranted."

On July 10, 2018, Riddick made another request to be seen by mental health, and Huff responded. At that time, Riddick complained about Trent, saying that he "lies to me." Huff told Riddick that he had been referred to the institutional psychiatrist, and any further testing or treatment would be up to that practitioner. (Fletcher Aff. ¶ 69; Huff Aff. ¶ 9.) Two days later, Trent assessed Riddick during a routine special housing review. Riddick told Trent that he was not going to comply with a directive to participate in an anger management group. Trent also documented that Riddick refused offers for confidential office visits, and Riddick stated that he was not showing any signs of mental health issues at that time. (Fletcher Aff. ¶ 70; Trent Aff. ¶ 16.)

On July 13, 2018, Riddick was seen by Dr. McDuffie, the institutional psychiatrist. Dr. McDuffie documented concerns about possible malingering, but he elected to prescribe Zyprexa (a mood stabilizer) and Prozac (an anti-depressant) for Riddick to address his reported symptoms. (Fletcher Aff. ¶ 71.) At that time, Dr. McDuffie listed Riddick's diagnosis as depressive disorder.[4] (ECF No. 51-1, at 312.) After that visit, Riddick's mental health code was adjusted to MH-2, reflecting "mild impairment." (Fletcher Aff. ¶ 71; Trent Aff. ¶ 18.)

Since that time, Riddick has remained under the care of Dr. McDuffie, and he does not assert any claims against Dr. McDuffie arising from that treatment. And, as already discussed, the court has dismissed claims against Trent that arose after Riddick began being treated by Dr. McDuffie.

At the time of Fletcher's affidavit—November 2021—Riddick was not prescribed or receiving any psychiatric medications, (Fletcher Aff. ¶ 77), although Riddick states that this is because he could not tolerate the side effects. His only diagnosis at that time was post-traumatic stress disorder, not otherwise specified. (*Id.*)

## C.

In his sworn statements, Riddick disputes the accuracy of Trent's reports and assessments in several important respects, particularly from 2016 through 2018. First, contrary to Trent's reports, Riddick states that he repeatedly complained to Trent about depression and anxiety, not just memory problems, and that Trent did not document those complaints. For

---

[4] Riddick states in his complaint that Dr. McDuffie diagnosed him with various mental illnesses, including schizophrenia. (Compl. 3.) But that diagnosis does not appear in the July 13, 2018 treatment notes (ECF No. 51-1, at 312), and Riddick does not direct the court to any specific date or portion of his mental health record containing that diagnosis.

example, he repeatedly reported to Trent that he had lost interest in doing things and that he was "down on life." (Pl.'s Opp'n  to Mot. Summ. J. 12 [ECF No. 60].) He also told Trent a number of times he was hearing voices, which Trent did not record in his reports.

Second, Riddick contends that Trent's reports were inaccurate in describing Riddick's physical condition and in stating that he was adequately accomplishing his "activities of daily living." (*Id.*) In fact, Riddick contends, he often went months without showering, shaving, or leaving his cell. Also, his cell was regularly dirty. He contends that Trent observed his lack of hygiene and his dirty cell, but failed to note it on his reports, instead reporting the opposite, in rote fashion. Riddick also takes issue with Trent's use of the words "not remarkable" to describe the symptoms Riddick reported to him during their April 2018 office visit. (*Id.* at 10.)

Third, Riddick states that Trent did not offer him numerous office visits, although it is unclear whether he believes Trent *never* offered him an office visit, or just not as often as is documented in the records. In fact, he points out that he submitted an informal request in April 2018 about Trent cancelling visits with him. He also contends that Trent went months without talking to him during rounds after Riddick had filed complaints about him. (*Id.* at 13.)

Riddick further asserts that Trent told him in March 2018—and even before then— that he was an "at-risk offender." Despite this, Trent's written reports treated Riddick as if he was not at risk, particularly in failing to refer him to Dr. McDuffie and suggesting he do "puzzles" to treat his many mental health challenges. (*Id.* at 11.) He points out that the March 29, 2018 visit notes document Riddick's report that his "depression, anxiety, [and] memory loss" had been happening for some time, but Trent nonetheless did not refer him to Dr. McDuffie.

In sum—and contrary to Trent's reports—Riddick alleges that he expressed his mental health symptoms "for [two] years" and still was not referred to the psychiatrist. (*Id.* at 11.) Riddick also contends that the "mini exam" administered by Trent in April 2018 did not address the symptoms he had expressed to Trent, such as depression, anxiety, paranoia, and hearing voices. Thus, even if he passed or did well on that mini exam, he claims it should not have been a factor in determining whether he was permitted to see Dr. McDuffie. (*Id.* at 15–16.) He also argues that the repeated nature of Trent's omissions and failures suggest his conduct was intentional. (*Id.* at 11.)

## D.

With regard to Kiser, Riddick's claims against him are based primarily on two conversations. For his part, Kiser has no recollection of either conversation. For purposes of summary judgment, then, the court will credit Riddick's version of what was said.

First, Riddick has attested that his first conversation with Kiser about his mental health treatment occurred on April 13, 2018. During that conversation, Riddick complained to Kiser that Trent had not timely referred him to Dr. McDuffie. He argues that this was a "serious situation" and that Kiser's failure to intervene led to a delay of treatment from April until July 13, 2018, when he was finally seen by Dr. McDuffie. (*Id.* 3–4.)

The second conversation occurred in June 2018, when Riddick spoke with Kiser about his symptoms worsening. Kiser allegedly told Riddick two times that he would have Dr. McDuffie visit Riddick, but Riddick's visit with Dr. McDuffie did not occur until July 2018. (*Id.* at 4.) Riddick asserts that his mental health deteriorated during that period and that he became "more anxious, depressed, paranoid, etc." (*Id.)*

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49(1986)).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up).

## III.

Defendants make five arguments in support of their motion for summary judgment. First, they argue that the statute of limitations bars all claims against Huff and Fletcher. (Defs.' Mem. 10–12.) Second, they claim that the Eighth Amendment claim against Kiser lacks merit. (*Id.* at 12–15.) Third, they claim that the Eighth Amendment claims against the mental health defendants fail on their merits both because (1) none of the three defendants had actual and subjective knowledge that Riddick was being denied objectively required mental health

treatment; and (2) Riddick has not presented evidence of "substantial harm" as a result of any delay in seeing the psychiatrist. (*Id.* at 15–18.) Fourth, they contend that the official-capacity claims are barred because defendants are immune from suit. And fifth, defendants argue that they are entitled to qualified immunity as to Riddick's individual-capacity claims against them. The court will address each of these arguments, although not in the same order as defendants raised them.

## A.

Riddick states that he is asserting claims against defendants in their individual and official capacities. But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Instead, in their official capacities, defendants are immune from suit under § 1983 and cannot be sued for monetary damages. *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996). Although official-capacity claims for injunctive relief can sometimes be maintained, *see Ex parte Young*, 209 U.S. 123 (1908), Riddick's complaint does not seek any injunctive relief. (Compl. 11.) Thus, all official-capacity claims against all defendants must be dismissed.

## B.

The court will next address Riddick's claims against the remaining defendants in their individual capacities. To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). This includes serious mental health needs. *DePaola v. Clarke*,

884 F.3d 481, 486 (4th Cir. 2018) ("[C]ourts treat an inmate's mental health claims just as seriously as any physical health claims.").

A prison official is "deliberately indifferent" only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

A claim concerning a disagreement between an inmate and medical staff regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Likewise, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Thus, an "error of judgment" on the part of prison medical staff or "inadvertent failure to provide adequate medical care," while perhaps sufficient to support an action for malpractice, does not constitute a constitutional deprivation redressable under § 1983. *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). Instead, the defendant's conduct must be "so grossly incompetent, inadequate, or excessive so as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

A delay in medical treatment, as opposed to a complete deprivation, also may constitute deliberate indifference. *See Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009); *Estelle*, 429 U.S. at 104 (explaining that deliberate indifference can occur where "prison guards [are] intentionally

denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"). In such cases, a plaintiff must show not only that his medical need was objectively serious, but also that the delay in providing medical care caused him to suffer "substantial harm." *See Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). In the context of physical medical needs, "the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs.*, Case No. 3:10cv90, 2011 WL 3489661, at *6 (E.D. Va. 2011); *see also Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995). For serious mental health needs, courts have found "substantial harm" where, for example, a prisoner engaged in self-harm, expressed suicidal ideation, or experienced severe mental health symptoms during the period of delay. *E.g.*, *Washington v. O'Neal*, No. 19-CV-03129-MEH, 2021 WL 103061, at *4 (D. Colo. Jan. 12, 2021) (holding that a "risk of serious self-harm" constitutes "substantial harm" from a delay in mental health care); *Dominguez v. Colfax Cnty.*, No. CV 14-875 MV/KRS, 2018 WL 3621018, at *11 (D.N.M. July 30, 2018) (reasoning that extending, for an additional four days, plaintiff's "experience of psychosis and mania," could satisfy the substantial harm requirement).

Here, defendants do not contest—for purposes of their summary judgment motion—that Riddick had an objectively serious mental health need. (Defs.' Mem. 15.) Thus, the court need only determine whether a reasonable factfinder could conclude that any of the defendants was subjectively indifferent to a known and substantial risk of harm to Riddick.

Turning first to Riddick's claims against Kiser, they are based on the two brief conversations between the two men—the first, on April 13, 2018, and the second, sometime in June 2018. *See supra* Section I-D. Riddick insists that, despite Kiser's assurance during the

June 2018 conversation that he would ask Dr. McDuffie to visit Riddick, Kiser never did so. He contends that, if Kiser had asked, Dr. McDuffie would have visited him "right away" because Riddick would have been referred by "the top prison official." (Pl.'s Opp'n 1.)

Riddick also points out that, as of May 2018, an appointment with Dr. McDuffie had not been scheduled. He claims that he was not told of any appointment with Dr. McDuffie until the following month. As such, he reasons that Kiser's action, if any, was not "immediate." If Kiser had acted immediately, Riddick's argument continues, he would have gotten an appointment "way before" July 2018, and probably not more than a month after the request was made. (*Id.* at 3.) Thus, he contends that Kiser's apparent failure to act delayed his treatment. (*Id.*)

Upon review of the undisputed facts, the court concludes that no reasonable factfinder could find in Riddick's favor as to his claims as against Kiser. Kiser is a non-medical prison official. When a prisoner is under the care of medical personnel, non-medical officials may rely on the judgment of those medical personnel as to what treatment the prisoner needs. The officials "cannot be liable for the medical staff's diagnostic decisions" and "cannot substitute their judgment for a medical professional's prescription." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).

As a general matter, a non-medical provider cannot be held liable for a failure to provide an inmate medical treatment where, as here, that inmate is under the care of health-care providers for the ailment or injury. *Miltier*, 896 F.2d at 854 (holding that non-medical personnel are entitled to rely on the professional judgment of medical practitioners to determine appropriate treatment for a patient); *see also Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir.

2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)) (reasoning that "'[i]f a prisoner is under the care of medical experts . . ., a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands'").

With this authority in mind, Kiser's apparent decision not to interfere or intervene with the assessments of the psychology associates as to whether a referral to Dr. McDuffie was needed is not actionable. It is undisputed that, at the time of Kiser's conversations, Trent—a trained mental health practitioner—was meeting regularly with Riddick. Indeed, Trent completed testing of Riddick in April 2018, the same month as Riddick's first conversation with Kiser. The warden was entitled to rely on Trent's expertise as to whether a referral to the psychiatrist was required. Moreover, Kiser has provided undisputed testimony that he could not have scheduled an appointment for an inmate with the institutional psychiatrist. (Aff. of Jeffrey Kiser ¶ 6 [ECF No. 59].) For all of these reasons, Kiser's failure to act or to secure or request an appointment was not deliberate indifference.

Furthermore, to prevail on a claim that medical care was delayed (as opposed to denied altogether), a plaintiff must present evidence of "substantial harm." In his opposition brief, Riddick states that his symptoms worsened between April and July; in particular, he claims his mental health deteriorated and he became "more anxious, depressed, paranoid, etc." (Pl.'s Opp'n 4.) But, according to Riddick himself, any delay attributable to Kiser was, at most, two months. As noted, Riddick alleges that if Kiser had acted promptly, he would have been seen within a month (or by May 18, 2018). Riddick certainly has not presented evidence from which a reasonable factfinder could find that the delay over those two months alone caused him substantial harm, as required to prevail on his Eighth Amendment claim. *Cf. Fielder v. Fornelli*,

No. CIV.A. 09-881, 2011 WL 4527322, at *9 (W.D. Pa. Sept. 6, 2011), *report and recommendation adopted,* No. CIV.A. 09-881, 2011 WL 4527374 (W.D. Pa. Sept. 28, 2011) (finding insufficient allegations of "substantial harm" where delay in receiving mental health evaluation after plaintiff's request was between two and three months). Kiser is thus entitled to summary judgment as to the claims against him.

Turning to the claims against Huff and Fletcher, the court recognizes that these defendants argue that all claims against them are barred by the applicable statute of limitations, because their personal treatment of Riddick all occurred more than two years before July 13, 2018 (when his cause of action accrued) or *after* July 13, 2018, when Riddick already was under the treatment of Dr. McDuffie. (Defs.' Mem. 10–12.) Riddick's opposition does not directly address defendants' statute-of-limitations defense. Because the court concludes that the claims against Huff and Fletcher fail on their merits regardless, it is unnecessary to resolve the statute-of-limitations issue.[5]

As to the merits of the Eighth Amendment claims against these two defendants, Riddick's opposition clarifies that he is attempting to hold Fletcher and Huff liable under a theory of supervisory liability. (Pl.'s Opp'n 4, 8.) He argues that, as Trent's supervisors, they should have been aware of Trent's reports about Riddick. He therefore claims that they were

---

[5] Defendants mentioned in their motion to dismiss, but failed to discuss in their summary judgment briefing, the "continuing violation" theory, adopted by the Fourth Circuit in the context of a similar medical claim. *DePaola,* 884 F.3d at 487. In *DePaola,* the court held that a prisoner could "allege a continuing violation under Section 1983 by identifying a series of acts or omissions that demonstrate deliberate indifference to a serious, ongoing medical need." 884 F.3d at 487. In such a case, the statute of limitations would not begin to run "until the date, if any, on which adequate treatment was provided." *Id.* Significantly, the claim "may extend back to the time at which the prison officials first learned of the serious medical need and unreasonably failed to act." *Id.* (citing *Heard v. Sheahan,* 253 F.3d 316, 318 (7th Cir. 2001)). Thus, viewed as a series of denials of treatment, Riddick's claim may reach back to some of the actions that Huff and Fletcher claim are time-barred.

aware of his mental health symptoms. According to Riddick, that knowledge, coupled with general knowledge they should have concerning the mental health effects of long-term stays in solitary confinement and the warning signs of suicide, is sufficient to hold them liable.[6] (*Id.* at 5–7.)

As an initial matter, the court concludes that the evidence before the court would not allow either Fletcher or Huff to be held liable on a supervisory liability theory. To establish such liability, Riddick must allege facts sufficient to show that the defendant (1) "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, the record before the court fails to satisfy even the preliminary requirement that either Fletcher or Huff be Trent's supervisor. Huff had the same position as Trent (a psychology associate) and Fletcher was a psychology associate II, but Riddick points to no

---

[6] These factual allegations appear to overlap, at least to some degree, with claims made on Riddick's behalf in a class action case pending before another judge of this court. *See Thorpe v. Va. Dep't of Corrs.*, No. 2:20-cv-00007-JPJ-PMS (W.D. Va.), May 6, 2019 Am. Compl., ECF No. 1 (alleging that the named plaintiffs, which include Riddick, suffered severe physical and mental health damage as a result of their placement in long-term solitary confinement). Despite that overlap, the court does not believe that its ruling in this case affects the claims in *Thorpe*. This case focuses on the alleged denial of treatment during a specific period of time stemming from deliberate indifference from several specific individuals, and the complaint does not seek injunctive relief. In the *Thorpe* case, the class members are seeking declaratory and injunctive relief, as well as damages, from mostly different defendants, related to VDOC's implementation of its long-term solitary confinement programs. *Id.* at 95–97. The only overlapping defendant is Kiser, but his involvement with VDOC's long-term solitary confinement programs is not at issue here.

evidence or allegation that either of them actually supervised Trent.

Moreover, neither the fact that Huff and Fletcher were familiar with Trent's reports—which they may have seen in the course of reviewing his file—nor their receipt of any complaint from Riddick about Trent is sufficient to show that either "had actual or constructive knowledge that [Trent] was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff." Riddick also fails to present sufficient evidence to establish the other elements of a supervisory liability claim. Thus, any supervisory liability claims fail. If either defendant  is to be held liable for an Eighth Amendment violation, it must be based on his or her own deliberate indifference.

In considering each of their own actions, the court emphasizes that Huff's and Fletcher's interactions with Riddick at Red Onion were very limited.[7]  Huff assessed Riddick once in 2011 upon his admission to Red Onion and once in 2012. In both of these assessments, Huff found Riddick's mental health code of MH-0 to be appropriate. Additionally, in November 2016, Huff reviewed Riddick's mental health records and determined that he did not meet the criteria to be designated as seriously mentally ill (SMI). Riddick does not argue that Huff's records of these visits or his observations were inaccurate. Huff's only other interaction with Riddick was to respond to a complaint by Riddick in July 2018. This occurred after Riddick had been notified of his appointment with Dr. McDuffie

---

[7] In addition to the personal interactions described here, both Fletcher and Huff responded to informal complaints submitted by Riddick. Huff responded to five, only one of which occurred before July 2018. In March 2018, Riddick complained about a cancelled appointment with Trent and the fact that Trent wanted to evaluate him during an office visit, rather than from his cell. Huff responded that Riddick had been offered an opportunity for further evaluation, that the offer remained open and that all Riddick needed to do was request further evaluation and Trent would make the necessary arrangements. (Huff Aff. ¶ 10.) Fletcher responded to two informal complaints, neither of which occurred before July 2018. (Fletcher Aff. ¶¶ 81–82.)

and approximately one week before Riddick was seen by Dr. McDuffie. Huff responded to his complaint noting he had an upcoming appointment.

It is unclear what Riddick expected Huff to do differently or how Huff's conduct, especially given the limited interactions that he had with Riddick, amounted to deliberate indifference. Huff is entitled to summary judgment.

Like Huff, Fletcher had very limited interactions with Riddick prior to July 2018. Fletcher conducted three evaluations in late 2014 and one in early 2015. Again, following each visit, Fletcher found Riddick's mental health code of MH-0 to be appropriate. (Fletcher Aff. ¶¶ 45–46, 79.) And as with Huff—and unlike with Trent—Riddick does not contend that Fletcher's records of these visits or her observations were inaccurate. Fletcher had no personal contact with Riddick after July 2018, although she did review Riddick's file to determine whether he met the criteria to be designated as SMI in July 2020. Fletcher concluded that Riddick did not qualify as seriously mentally ill "because his mental health diagnoses did not result in severe functional impairment." (Fletcher Aff. ¶ 80.)

The only evidence Riddick offers in response is to say that he told Fletcher directly about his mental health symptoms in "early 2018 and prior to April 2018," and also told Fletcher that Trent would not refer him to Dr. McDuffie. (*Id.* at 7.) According to Riddick, Fletcher responded that Riddick should send a request. But when Riddick did so, he claims that he did not receive a response. (*Id.*) Riddick does not say when he submitted the request, and Riddick has not produced a copy of that purported request.[8] At most, then, Fletcher had

---

[8] As noted, though, a request from Riddick was received in July 2018, was directed toward the mental health department, and Huff responded. Two other written requests by Riddick were routed to Trent, who responded

knowledge from sometime in early 2018 that Riddick was having some mental health symptoms and that he wanted to be seen by a psychiatrist, and Fletcher did nothing in response.

Similar to Kiser's alleged failure to respond to Riddick's complaints in a timely fashion, Fletcher's inaction led to—at most—a delay in obtaining a referral to the prison's psychiatrist. The length of that delay is unclear because Riddick does not provide exact dates of the conversation with Fletcher, but from some point in "early 2018" to early July, yields a period of six months, at most. But Riddick was being monitored by Trent at that time. Moreover, Riddick has failed to present any evidence showing that Fletcher subjectively believed that Riddick would suffer serious harm if Fletcher did nothing. Put differently, he has failed to show that Fletcher not only knew "of facts from which the inference could be drawn that a substantial risk of serious harm exists," but also drew "the inference" that doing nothing could lead to serious harm. *Farmer*, 511 U.S. at 837. Indeed, if Fletcher had been reviewing Trent's reports, as Riddick claims, then she would have thought Riddick began reporting mild symptoms only in April 2018, and that Riddick was being monitored by Trent, including via testing. No reasonable factfinder could find that Fletcher's conduct was so "grossly incompetent, inadequate, or excessive so as to shock the conscience or to be intolerable to fundamental fairness." *See Miltier*, 896 F.2d at 851. Fletcher, too, is entitled to summary judgment.

But the same cannot be said of Trent. Trent argues that he repeatedly met with and

---

in May 2018. Riddick presents no documentation to support that there was an *additional* request in 2018 that went unanswered.

assessed Riddick's mental health, and insists that the mental health records support that Riddick did not report any mental health concerns until 2018. As noted in discussing the factual background, though, Riddick disputes the accuracy of those reports. Thus, there is a clear factual dispute as to what symptoms Riddick reported to Trent and when. Construing the facts in the light most favorable to Riddick, as the court must, Riddick spent two years reporting to Trent numerous mental health symptoms, including depression, anxiety, paranoia, and hearing voices. Not only did Trent fail to document these reported symptoms or offer any further evaluation until April 2018 (in the form of a mental status exam Riddick claims is irrelevant to those symptoms), he, according to Riddick, repeatedly misrepresented his observations about Trent's physical appearance and the condition of his cell, rather than accurately reporting them.

If Trent had acknowledged Riddick's complaints of symptoms in his reports, but nonetheless believed that they did not warrant a referral to a psychiatrist—and if Trent had explained why in his affidavit to this court—then he might well be entitled to summary judgment. As defendants note, disagreements between a plaintiff and his provider over the proper course of treatment or whether treatment is warranted do not generally give rise to an Eighth Amendment violation. *Wright*, 766 F.2d at 849. And if that were the situation, then perhaps Riddick's repeated complaints and requests to see Dr. McDuffie could be classified, as defendants suggest, as simply a "self-referral" that was contrary to Trent's informed decision based on his training and experience. But Trent did not acknowledge Riddick's complaints. Further, he does not explain why two years of such symptoms were not included in his reports, or why those reported symptoms did not warrant a referral to a psychiatrist. He also does not

explain why he changed his mind about Trent's need for a psychiatrist between April and late May 2018, except to say he discussed it with the treatment team.

A reasonable factfinder may ultimately determine that Riddick is not truthful and that Trent's reports and assessments were accurate. In that case, judgment in Trent's favor likely would be appropriate. Alternatively, qualified immunity might be appropriate—as defendants contend—on the grounds that there was no clearly established right for a prisoner to "self-refer" to a psychiatrist for treatment. But at the summary judgment stage, the court cannot make that credibility determination. Instead, it has before it facts that Riddick reported psychiatric symptoms for at least two years, including depression, anxiety, paranoia, and hearing voices, and that Trent failed to include those concerning symptoms in his records. Trent also included other information that he would have known would be false, such as that Riddick's hygiene was good and that his cell was clean and orderly. On those facts, a reasonable factfinder could conclude that Trent's failure to record and evaluate those symptoms, as well as his failure to refer Riddick to a psychiatrist for evaluation, constituted deliberate indifference.

Additionally, on this record, the court concludes that Trent is not entitled to qualified immunity. While there may not have been a clearly established right to self-refer to a psychiatrist, there was a clearly established right to necessary mental health treatment, as of July 2018. *See DePaola v. Clarke*, 394 F. Supp. 3d 573, 591–94 (W.D. Va. 2019) (denying qualified immunity to Fletcher, Huff, and Trent where there was a dispute of fact as to what they knew about plaintiff's mental health complaints and where the plaintiff was not referred to a psychiatrist, not given medication, and not given "meaningful counseling," but simply

"monitored and assessed as having little or no impairment"). In denying qualified immunity, the district court in *DePaola* discussed *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977), which recognized that prisoners are entitled to necessary mental health care. And, as noted, the factual conflicts, if resolved in Riddick's favor, would suggest Trent ignored symptoms for years, not just that he disagreed with Riddick's request to see a psychiatrist.

Trent also argues that he is entitled to summary judgment because Riddick has failed to show that any delay resulted in "substantial harm," as he must to state an Eighth Amendment claim. But construing facts in Riddick's favor, there are facts from which a reasonable factfinder could find the requisite harm. These include that Trent ignored and failed to document two years' worth of reports of serious psychiatric symptoms and thus that those symptoms continued—and according to Riddick, worsened—without treatment for two years, far longer than the two-month delay caused by Kiser. Indeed, at his very first appointment with Dr. McDuffie, Riddick was prescribed psychiatric medications, which suggests that he likely would have received that (presumably necessary) medication sooner had Trent acted sooner. The court believes that a reasonable factfinder could conclude from these facts that Riddick suffered substantial harm during that two-year delay in treatment, particularly because—at least for summary judgment purposes—defendants do not dispute that Riddick had a serious medical need.

For all of the foregoing reasons, the court will deny the summary judgment motion as to the Eighth Amendment claim against Trent, based on his actions or inactions up to July 13, 2018, and will otherwise grant the motion.

### IV.

### A.

Riddick has styled his opposition to defendants' motion as a motion for summary judgment. Such a motion would require the court to view the evidence in the light most favorable to defendants. So viewed, Riddick's motion as it pertains to his claims against Kiser, Huff, and Fletcher must be denied for the same reasons that defendants' motion must be granted—Riddick has not presented facts from which a reasonable factfinder could find in his favor, even construing them in his favor. As to the claims against Trent, the same disputes of fact that preclude entry in Trent's favor also preclude entry of any judgment in Riddick's favor. Instead, a jury must make credibility determinations and decide whether they believe Riddick's or Trent's version of their encounters.

### B.

As noted, Riddick also has filed a motion for preliminary injunction in which he asks the court to order his release from the restrictive housing unit. (Dkt. No. 44.) This motion is subject to denial for a number of reasons, but the court will simply rely on one.[9] Most fundamentally, Riddick's removal from a particular housing unit where he is subject to solitary confinement would not be appropriate injunctive relief tailored to remedy Trent's failure to refer Riddick earlier to Dr. McDuffie, the only claim remaining in the case. Even if Riddick

---

[9] Such relief also would overlap with the claims in the class action to which Riddick is a party. *See supra* note 6. Additionally, Riddick claims that his request for injunctive relief is supported by a report prepared by a psychologist, Dr. David Reed, which apparently addresses the mental health effects of Riddick's confinement in long-term segregation. By Riddick's own admission, however, that report was based on interviews Dr. Reed conducted with Riddick in August 2020. (Opp'n 17.) Thus, although Riddick insists the court should review that document, his mental status at least two years after the pertinent events do not inform whether Trent was deliberately indifferent in 2018 and earlier. Regardless, neither party has pointed to that report in the record of this case, and it is not in Riddick's mental health records submitted by defendants.

had sought injunctive relief in his complaint—which he did not—the appropriate injunctive relief in the event he were to prevail would be a referral to and treatment by a psychiatrist. That is relief that Riddick began receiving before this suit was filed and which—at least as of the briefing of summary judgment—he continues to receive. His motion for preliminary injunction will be denied.

## C.

Riddick also filed other documents, but they do not require a lengthy discussion. First, he submitted several letters requesting a ruling on the present summary judgment motion. (ECF Nos. 65, 67.) In light of the court's rulings herein, those requests are now moot.

Riddick also filed a lengthy affidavit, referencing this case and four others. (ECF No. 84.) In it, he primarily complains about statements and rulings in other cases by the assigned U.S. Magistrate Judge, which are irrelevant here. (*See generally id.*) As it relates to this case, he questions the timing of defendants' motion for extension and the granting of that motion. (*Id.* at 8–10, 12.) The court has reviewed the docket and documents he references and does not find any support for his assertion that there was any irregularity or that U.S. Magistrate Judge Sargent has exhibited bias toward him, extra-judicial or otherwise. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (noting that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); *People Helpers Found. v. City of Richmond*, 12 F.3d 1321, 1325 (4th Cir. 1993) ("[T]he nature of the judge's bias must be personal and not judicial."). He further states that he is filing a judicial misconduct complaint against the undersigned, Judge Sargent, and United States District Judge Dillon, but that action likewise does not require recusal. *Richardson v. Stanford*, No. 7:16-cv-00329, 2017 WL 1102715, at *2 (W.D. Va. Mar. 23,

2017) (declining to recuse despite a judicial misconduct complaint against presiding judge based on disagreement with judicial rulings). So, to the extent his "affidavit" can be construed as a request for recusal, it is denied.

## V.

For the reasons set forth above, the court will grant in part and deny in part Defendants' motion for summary judgment. The court will deny Riddick's summary judgment motion and deny his motion for preliminary injunction.

The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 21st day of February, 2023.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE